### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---

**WILLIAM ERNESTO CHILIN MORALES,** *et al.*,

> **Plaintiffs,**

> **v.**

**MELVIN HUMPHREY,**

> **Defendant.**

---

**Civil Action No. 14-1363 (JEB)**

## MEMORANDUM OPINION

Plaintiffs in this case are three maintenance workers formerly employed by a residential landlord in the District of Columbia.  In this suit, they allege that in 2012, 2013, and 2014, their erstwhile employer, Defendant Melvin Humphrey, failed to pay them overtime wages as required by D.C. and federal law.  The federal statute they believe entitles them to overtime payment is the Fair Labor Standards Act, which mandates time-and-a-half wages for hours worked over forty each week.  See 29 U.S.C. § 207(a)(1).  The Act, however, applies only to "enterprise[s] engaged in commerce," id., a class of businesses whose characteristics include, *inter alia*, earning at least $500,000 per year.  See 29 U.S.C. § 203(s)(1)(A)(ii).  Convinced that his business brought in less than that amount during the years that Plaintiffs worked for him, Humphrey quickly moved for summary judgment on that basis.  Plaintiffs rejoined that they had no way of knowing how much Defendant's business earned without discovery; agreeing, the Court denied Humphrey's motion without prejudice.

Discovery having now concluded, Humphrey again moves for summary judgment on the same ground.  In essence, then, Defendant's present Motion poses the $500,000 Question: Did

his rental business earn enough, in gross receipts, to qualify as an "enterprise" governed by the FLSA or not?  As it turns out, the record still does not admit of a clear answer, so the Court will again deny summary judgment.

## I.     Background

Most of the underlying facts of this case are undisputed.  The Court will first set out those facts, as well as the case's procedural history.  It will later delve into the disputed facts in the Analysis section.

Plaintiffs William Ernesto Chilin Morales, Jorge Eduardo Rico Turrubiartes, and Carlos R. Orellana-Murga are former employees of Humphrey who worked to maintain low-income apartment and housing units Defendant owns and leases in the Southeast quadrant of the District of Columbia.  See ECF No. 20, Attach. 6 (Defendant's Statement of Facts), ¶¶ 1-3; ECF No. 21 at 2-4 (Plaintiffs' Statement of Facts) at 2, ¶¶ 1-9.  Humphrey owns approximately twenty properties and leases around eighty residential units.  See Def. SOF, ¶ 3; Pl. SOF, ¶ 9.  The only records Humphrey keeps regarding the rent paid by his tenants are his bank statements; he maintains no other accounting records relating to these apartment units.  See Def. SOF, ¶ 4; Pl. SOF, ¶ 10.

All three Plaintiffs worked for Humphey from 2012 to 2014, although their start and end dates differ slightly.  See Def. SOF, ¶¶ 10, 12-13; Pl. SOF, ¶¶ 3, 5, 7.  Plaintiffs were paid a daily amount, regardless of the hours they worked each day: Morales received $120, and Murda and Turrubiartes each received $135.  See Def. SOF, ¶¶ 9-13; Pl. SOF, ¶¶ 3-8.

Plaintiffs allege in their Complaint that this rate was intended to cover eight hours of work per day, and that under federal and D.C. law, they should have been compensated at a rate of one and a half times their regular hourly rate for all additional hours worked.  See ECF No. 3

(Amended Complaint) at 1-2.  According to Plaintiffs, on many weeks they were compensated for only forty hours of work (five daily payments), even though they were "required to work an average of sixty hours per week."  See id., ¶¶ 9-11.  At least one Plaintiff, Murga, was eventually terminated as a result of his repeated requests for overtime payment.  See id., ¶ 12.

Plaintiffs filed suit in this Court in August of 2014, contending that Defendant's compensation practices violated the overtime-protection provisions of the D.C. Minimum Wage Revision Act (DCMWRA), the D.C. Wage Payment and Collection Law (DCWCL), and the federal Fair Labor Standards Act (FLSA).  See id. at 1.  In March of 2015, Defendant moved for partial summary judgment.  See ECF No. 9, Attach. 2 (First MSJ).  He argued, principally, that he did not meet the minimum-income requirement of the FLSA, which covers only enterprises earning at least $500,000 per year.  See First MSJ at 3.  He attached redacted versions of his bank statement as proof that his business brought in less than the half-million dollars required by the statute.  See id., Exhs. A, B, C.

Yet the Court was not persuaded.  It found that the question of whether Humphrey's real-estate business satisfied the FLSA's threshold income requirements was premature without further discovery, as Plaintiffs had argued, and it denied his partial-summary-judgment motion without prejudice.  See Morales v. Humphrey, 309 F.R.D. 44, 48-49 (D.D.C. 2015).  It permitted additional discovery under Federal Rule of Civil Procedure 56(d) so that Plaintiffs could gather "facts essential to justify [their] opposition" to Humphrey's motion, including by "obtain[ing] affidavits or declarations."  Id. at 47 (quoting F.R.C.P. 56(d)).

The record now fleshed out, Defendant renews his Motion for Summary Judgment.  See ECF No. 20.  The current Motion largely mirrors its predecessor, arguing again that the business does not meet the $500,000 FLSA threshold.  See MSJ at 4-5.  Defendant also addresses in part

the merits of Plaintiffs' FLSA claim, contending that one Plaintiff was entitled only to minimum-wage payments and that, at most, Defendant is liable only for one half the regular rate for Plaintiffs' overtime hours.  See id. at 6-9.  More important, this time around the parties' briefings have the benefit of Humphrey's full, unredacted bank statements, produced during discovery.  See ECF 21 (Opp.), Exh. 6 (Full Bank Statements).  The Court, accordingly, will revisit the FLSA income requirement with the aid of this additional evidence.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. Potomac Electric Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a

4

motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). In light of this requirement, and pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-judgment motions, "assume[s] that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

## III.   Analysis

As the Court explained in its prior Opinion, see Humphrey, 309 F.R.D. at 47, Congress enacted the Fair Labor Standards Act of 1938 to eliminate conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). At the same time, it wanted to avoid "substantial[] curtailing [of] employment or earning power." Id. § 202(b). The statute therefore sets guidelines for establishing the minimum wage an employee must be paid, see id. § 206, and sets an overtime-wage requirement of 150% of the regular rate for any hours over forty worked in a single week. See id. § 207. The gravamen of Plaintiffs' suit is that Humphrey willfully and repeatedly violated these provisions by refusing to compensate Plaintiffs at anything other than a

fixed daily rate, regardless of the total hours they worked per week.  See Am. Compl., 1-2, ¶¶ 23-24.

The FLSA overtime provisions, however, do not apply to all employers. The Act governs only employers who are part of an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207(a)(1).  The law regarding "enterprise" coverage under the FLSA is well settled and relatively straightforward, so the Court will not linger here.  Suffice it to say that the FLSA defines an "enterprise engaged in commerce or in the production of goods for commerce" as one that "has employees engaged in commerce" and "whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i)-(ii).  It is this latter facet of the "enterprise" inquiry that is the source of the parties' key dispute: Plaintiffs contend that the gross income from Humphrey's real-estate business exceeds $500,000 per year, and Humphrey insists that it does not.  The Court looks at this central question and then briefly addresses Defendant's remaining contentions.

A.  FLSA "Enterprise" Threshold

After discovery, the parties' dispute is, in fact, even narrower.  The sides agree that the sole source of income for Humphrey's business is the rental payments he collects from tenants leasing housing units in his properties.  See MSJ at 5; Opp. at 6.  They also concur that the only records extant that show the rent collected are the bank statements for his business account.  See MSJ at 5 & Exh. A (Deposition of Melvin Humphrey) at 29:15-31:2; id. at 30:12-22 ("Everything – everything that I collected is . . . [i]n the bank records. . . . Everything for the rent is in there.").  As Defendant aptly notes, Plaintiffs do not dispute the accuracy or authenticity of those bank statements.  See ECF No. 22 (Reply) at 2.  Rather, where the rubber meets the road is in the interpretation of the statements.

1.  *The Parties' Calculations*

In his Motion – consistent with his deposition – Humphrey maintains that in the years 2012, 2013, and 2014, he "did not collect rent in excess of $500,000." Humphrey Depo. at 32:6-10. He asserts that his real-estate business earned only $384,437.42 in 2012, $416,714.97 in 2013, and $441,033.87 in 2014. See MSJ at 5. These revenue estimates, he says, are "added up from the records" in his bank statements. See Humphrey Depo. at 32:11-13.

Plaintiffs, naturally, disagree. After considering the unredacted bank statements and conducting their own calculations, they determined that Humphrey's business income totaled $559,613.70 in 2012, $513,519.02 in 2013, and $524,087.80 in 2014. See Opp. at 3-4. The wellspring of the variance between the parties' estimates is the characterization of particular entries in the bank statements, so some additional background about the statements bears further mention here.

Although he never incorporated or formed a separate business entity for his real-estate business, see Humphrey Depo. at 9:6-11, Defendant did maintain a bank account for the business that was separate from his personal account. See id. at 31:17-19. There, Humphrey avers, he deposited all of the rental payments he collected during the relevant years. See id. at 30:12-22. During his deposition, Defendant stated that he did not know how much he would receive in rent in a given month if all tenants were to pay their rent on time, nor did he know how much he typically did receive in any specific month. See id. at 29:5-14. He testified that he would have to "refer to the documents," meaning the bank statements for his business account, to come up with any such figures. Id. at 29:12-17. In addition, although some of his tenants paid their rent in cash, those cash payments were also deposited into his business bank account. Id. at 29:17-30:10. When asked whether "any other income" – beyond rental payments earned from his

7

housing units – appears in these bank statements, Humphrey answered in the negative, but he noted that he does occasionally "borrow money . . . from [his] personal account to pay the bills." Id. at 31:3-10.  At the same time, although he maintains that every rental payment he received was deposited into the business account, he also contends that every deposit that appears on the account's statements does not represent a rental payment.  See Reply at 3.

The roughly 300 pages that Plaintiffs submitted list what the statements call "additions" – i.e., deposits to – and "subtractions" – i.e., withdrawals from – Humphrey's business checking account.  Defendant never specifies, either in his deposition or in his briefings, how he identified particular "additions" listed in the statements as rental payments in order to arrive at his ultimate estimate of his annual rent collection in these three years.  A simple manner of doing so might have been, for instance, to highlight each line in the bank statement that he believes to be a rental payment and then to show his calculations adding together all of the highlighted payments.  For whatever reason, Humphrey chose not to provide the Court either with such illustrative materials or with any other robust support for his revenue estimates.

Nor, unhelpfully, did Plaintiffs follow their middle-school math teacher's advice to "show your work."  In support of their annual-revenue estimates, they offer a list of deposit amounts that they identified as "gross receipts" in Defendant's bank statements and included in their calculations.  See Opp., Exh. 7 (2012 Calculations), id., Exh. 8 (2013 Calculations), id., Exh. 9 (2014 Calculations).  Unfortunately, Plaintiffs do not identify the bank's description of each transaction they deemed a rental payment.   But at least they do append Defendant's full bank statements to their Opposition.  See Opp., Exh. 6 (Full Bank Statements).

Defendant objects to Plaintiffs' calculations because, in his view, they erroneously include deposits or additions that are not rental payments, meaning those entries should not be

considered "gross receipts" of his real-estate business.  See Reply at 3.  Specifically, he takes issue with deposits "noted in the bank statements as 'overdraft protection,' 'DC Tlr transfer,' or 'transfer from checking'" and contends that Plaintiffs should not have "included these non-rent amounts in their calculation of Defendant's annual revenue."  Id.  He also objects to the inclusion in those calculations of "Social Security payments and deposits due to return of posted checks," which he believes "Plaintiffs clearly knew about and even identified . . . but blatantly included." Id.  Other than these five types of deposits – overdraft protection, DC Tlr transfer, transfer from checking, Social Security, and posted-check return – Humphrey identifies no other deposits or transactions that are listed as additions in his bank statements but that he believes should not be included in any calculation of his business's annual revenue.

Plaintiffs' calculations, while leaving something to be desired, nevertheless allow the Court to cross-check their submissions with Defendant's full bank statements.  After so doing, the Court has determined that Plaintiffs' totals do include some of the kinds of deposits that Humphrey contends should not be included – *e.g.*, some deposits labeled "DC Tlr transfer," Social Security, and the like.  See, e.g., 2014 Calculations at 1 (including $987.00 Social Security payment and $12,000.00 "Return of Posted Check" in 2014 revenue calculation).   At the same time, Plaintiffs have inexplicably excluded various deposits that would seem, on the face of the statements, to be properly considered "income."  Compare, e.g., id. at 1 (excluding, without explanation, January 2, 2014, $1,575.00 addition labeled "Deposit," and other January 2014 deposits with same label) with Full Bank Statements at 202 (listing "Deposit" in amount of $1,575.00 on January 2, 2014).  The Court, therefore, decided to do its own calculations to determine whether the record – or, more precisely, Defendant's bank statements – mandate that a

factfinder arrive at an indisputable conclusion as to his business's annual revenue for each of the
relevant years.

2.   *The Court's Calculations*

The Court begins with a brief note about what these bank statements look like, to
illustrate for the reader the pleasure of interpreting them.  The statements list the date and
amount of each addition or subtraction but provide only a cursory description of the type of
transaction represented.  Sometimes, the statements label an addition as, simply, a "Deposit."
See, e.g., Full Bank Statements at 3 (labeling January 4, 2012, addition of $6,737.35 as a
"Deposit").  Other times, the statements specify whether the additions occurred via an ATM
deposit or a counter credit.  See, e.g., id. at 55 (labeling July 2, 2012, addition of $3,225.00 a
"BkofAmerica ATM" transaction).  And sometimes, a more specific source for funds is listed
next to the addition.  See, e.g., id. at 49 (labeling June 1, 2012, addition of $4,572.80 a "Bpd2
Treas 310" transaction).  The five types of deposits that Humphrey argues should not have been
included in Plaintiffs' calculation fall into this last category.  Cf., 29 C.F.R. § 779.259 ("What is
included in annual gross volume [under the FLSA:] . . . .  The gross volume of sales made or
business done means the gross dollar volume (not limited to income) derived from all sales and
business transactions including, for example, gross receipts from service, credit, or other similar
charges.").

While Defendant does not explain why these five types could never be considered part of
his business's income – transfers from his personal account for business purposes, for instance,
might fairly be considered "income" if they are never repaid – the Court (at the outset) gave him
the benefit of the doubt when doing its own calculations.  The Court totaled all deposits –
including only those labeled "Deposit," "BkofAmerica ATM" deposit, or "Counter Credit" and

excluding the five deposit types with which Humphrey took issue <u>and</u> others he did not expressly mention – for each of the three relevant years. Its calculations yielded totals that differed from both Plaintiffs' and Defendant's estimates: The Court tallied $503,983.57 in revenue for 2012; $495,180.22 for 2013; and $539,319.80 for 2014.

The Court, consequently, cannot grant Defendant's Motion on this record. For summary judgment is only appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [such that] there is no 'genuine issue for trial.'" <u>Scott</u>, 550 U.S. at 380 (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)). Here, a rational trier of fact could easily conclude – as the Court's own calculations demonstrate – that Humphrey's real-estate business earned at least $500,000 in 2012 and 2014.

Furthermore, although the Court's calculations for 2013 yielded a total $4,819.78 shy of the $500,000 threshold, a rational trier of fact might readily find that some of the additions in that year's bank statements that the Court did not include <u>should be</u> included in a revenue calculation for Humphrey. For instance, the Court excluded fifteen "Overdraft Protection" deposits for 2013, ranging from $296.73 to $7,599.79 – again, presumably constituting infusions of cash for the business – which Plaintiffs had included in their calculations. <u>See</u> 2013 Calculations at 1-3. If the Court had included just the $7,599.79 "Overdraft Protection" – and the Court's aforementioned calculations are otherwise accurate – the business would clear the $500,000 hurdle for 2013. In fact, including all of these "Overdraft Protection" payments would yield an annual-revenue total of $521,944.47. This says nothing of the "DC Tlr Transfer" and other unexplained payments appearing throughout the bank statements that the Court did not include in its calculations.

In other words, the Court's preliminary estimates are <u>conservative</u>, and a factfinder could certainly conclude that Humphrey's annual revenue for these years was much closer to Plaintiffs' well-over-$500,000 estimates. Indeed, a factfinder might find it odd that a business renting 80 units would not earn at least $500,000 per year; after all, if Humphrey rented each unit for a paltry $521 per month – well below market in the District of Columbia – his business would clear the half-million threshold. Perhaps, then, a jury would find Plaintiffs' interpretation of the bank statements more credible. In any event, on a Rule 56 motion, the Court must "eschew making credibility determinations or weighing the evidence," <u>Czekalski</u>, 475 F.3d at 363, and must draw "all justifiable inferences" in the non-movant's favor. <u>See Mastro</u>, 447 F.3d at 849-50. In this case, viewing the statements in the light most favorable to Plaintiffs precludes the Court from concluding, as a matter of law, that Defendant did not earn enough to clear the $500,000 FLSA threshold in each of the three years during which Plaintiffs worked for him.

Rather than offering "bare denials," Plaintiffs have "identif[ied] specific disputed facts showing that there is a genuine issue for trial" – namely, the amount of revenue earned by Defendant's business during the years he employed Plaintiffs. <u>See Ayala v. Tito Contractors, Inc.</u>, 82 F. Supp. 3d 279, 285 (D.D.C. 2015). Though Defendant contends that "Plaintiffs rely solely on speculation, misstatements and conclusory statements" in their arguments about his volume of business, <u>see</u> Reply at 2, the Court disagrees; Plaintiffs have provided evidence that would permit a reasonable jury to find in their favor, which is all they must do to defeat a summary-judgment motion. <u>See Laningham</u>, 813 F.2d at 1242; <u>cf.</u>, <u>Sandoval v. Florida Paradise Lawn Maintenance, Inc.</u>, No. 08-12903, 2008 WL 5250274, at *2-3 (11th Cir. 2008) (affirming district court's grant of summary judgment to defendants in FLSA case where plaintiffs,

"[i]nstead of producing evidence of [business] transactions, . . . argued that the district court should presume [defendant] . . . grossed over $500,000 annually").

To be sure, the bank statements are not always easy to read; indeed, the shorthand descriptions of the various transactions do not identify with clarity where deposits came from or where withdrawals were paid.  See Humphrey Depo. at 35:4-9 (Defendant agreeing that "the only thing that's reflected [in the bank statement] if you get a check, is, Check[.]  There's no way [anyone] could tell . . . where it came from").  At trial, it may become clear that one side's calculations (or the Court's) are more accurate than the other's.  Regardless, there can be no doubt that the bank statements establish a dispute about Humphrey's business's annual revenue – a fact all agree is material to the FLSA claim at issue.

Defendant asserts, in his defense, that this Court has already concluded that "'there is no factual dispute that his income did not meet the annual $500,000 threshold required by the FLSA.'"  MSJ at 5 (quoting Humphrey, 309 F.R.D. at 47).  But the first half of that sentence – which Defendant conveniently omits – includes a critical qualification of the Court's determination: "As Plaintiffs adduce no facts to contradict Humphrey's showing, the Court agrees with Defendant that, on the record submitted, there is no factual dispute that his income did not meet the annual $500,000 threshold required by the FLSA."  Humphrey, 309 F.R.D. at 47.  Plaintiffs are correct that the Court's statement then was "based on the heavily redacted bank statements and Plaintiffs' inability, at the time [before discovery] to adduce any facts 'to contradict Humphrey's showing.'"  Opp. at 6.  Now, of course, the record has been expanded with the fruits of discovery, and Plaintiffs have offered evidence to refute Humphrey's "enterprise" claims – viz., their own calculations of his business's annual gross receipts, and the

bank statements permitting the Court to do its own calculations.  Neither of those confirms Humphrey's assertion about this material fact.

      B.  <u>Other Contentions</u>

Defendant also argues that even if his real-estate business were an "enterprise engaged in commerce" under the FLSA, he would owe Plaintiffs far less than the amount of overtime payment they are seeking.  <u>See</u> MSJ at 8-9.  This argument relies principally on his assertion that "the undisputed facts establish that Plaintiffs all [agreed to] receive[] set rates per day without regard to the number of hours worked at the job."  <u>Id.</u> at 8.  Not so; Plaintiffs expressly dispute this fact, insisting that "[t]his purported fact[] incorrectly depicts Plaintiffs' contentions that they were paid at daily rates for all hours worked.  Plaintiffs[] maintain that their daily rates were only meant to compensate them for eight hours of work per day."  Pl. SOF, ¶ 16.  Defendant offers nothing to establish the veracity of his version of events, citing only his own statement of facts. Therefore, Defendant has, once again, failed to establish an absence of dispute as to the facts material to Plaintiffs' claim.  As such, the Court will deny his Motion entirely as to the FLSA count.

Finally, the only basis Defendant proffers for dismissing Plaintiffs' state-law claims is that the Court should not exercise supplemental jurisdiction over claims related to a federal claim that has been dismissed.  As the Court today rules that the federal claim survives, such an argument is obviously premature.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion for Summary Judgment.  A separate Order will so state.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  May 18, 2016